**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HENRY STURSBERG**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-1635-KSM** |
| **MORRISON SUND, PLLC, et al.,** | |
| Defendants. | |

**MEMORANDUM**

MARSTON, J.                                                December 11, 2020

Plaintiff Henry Stursberg sued his former attorney and law firm, Defendants Matthew

Burton, Esquire and Morrison Sund, PLLC, respectively, after a heated dispute over Defendants'

legal fees resulted in Defendants unilaterally withdrawing their representation of Plaintiff in an

underlying action, leaving Plaintiff unrepresented, and then filing an involuntary bankruptcy

petition against Plaintiff.  (*See* Doc. No. 1.)  In his complaint, Stursberg asserts six causes of

action against Defendants:  abuse of process, wrongful use of civil proceedings, tortious

interference with existing and prospective contractual relations, intentional infliction of

emotional distress ("IIED"), breach of contract, and credit defamation.  (*Id.*)

Defendants, Minnesota residents, have moved to dismiss the complaint on four different

grounds.  (Doc. No. 2.)  First, Defendants argue that this case should be dismissed for

insufficient service of process under Federal Rule of Civil Procedure 12(b)(5) because the

Morrison Sund secretary who signed the certified mail containing the complaint and summons

was not authorized to accept service on behalf of Defendants.  (Doc. No. 2-2 at pp. 19–20.)  In

addition, Defendants contend that the complaint must be dismissed for lack of personal

jurisdiction because they represented Stursberg in a Minnesota-based action and they filed the involuntary bankruptcy petition in Minnesota bankruptcy court.  As such, Defendants argue they lack sufficient minimum contacts with Pennsylvania.  (*Id.* at pp. 5–11; Doc. No. 7 at pp. 2–6.)  Third, Defendants assert that venue is improper because there is no evidence that a substantial part of the events or omissions giving rise to Stursberg's claims occurred in the Eastern District of Pennsylvania.  (Doc. No. 2-2 at pp. 11–12.)  Last, Defendants argue that Stursberg's state tort claims are pre-empted by federal bankruptcy law and therefore should be dismissed for failure to state a claim.  (*Id.* at pp. 14–19; Doc. No. 7 at pp. 6–8.)

In opposition, Stursberg contends that service is proper and Defendants should not be allowed to evade service.  (Doc. No. 6 at pp. 8–10.)  As to personal jurisdiction and venue, Stursberg argues that to the extent Defendants filed their wrongful involuntary bankruptcy petition against him, they should have done so in the Eastern District of Pennsylvania (i.e., Defendants falsely represented that Stursberg resided, had a principal place of business, or owned principal assets in Minnesota longer than in any other District in order to wrongly file an involuntary bankruptcy petition against him in Minnesota) and Defendants should not be able to escape personal jurisdiction in Pennsylvania or venue in the Eastern District by virtue of intentionally filing the involuntary bankruptcy petition in the wrong location.  (*Id.* at pp. 11–17.)  Stursberg also claims that by virtue of filing a "bad faith and perjurious" involuntary bankruptcy petition against a Pennsylvania resident, Defendants expressly aimed their conduct at Pennsylvania.  (*Id.*)

Defendants filed a reply (Doc. No. 7), and Stursberg filed a sur-reply (Doc. No. 16).  The Court held oral argument on November 19, 2020.

For the reasons discussed below, we grant in part Defendants' motion.

I.

The following facts are pled in the complaint or averred in Stursberg's affidavit, and taken in the light most favorable to Plaintiff.

Stursberg, a commercial mortgage broker and financial consultant, resides in Philadelphia, Pennsylvania, and is the principal owner of Stursberg and Fine ("S&F"), a mortgage brokerage and financial consulting firm that is also located in Philadelphia.  (Doc. No. 1 at ¶¶ 1–2, 8; *see also* Stursberg Aff. at ¶ 11.)  S&F manages and coordinates commercial loans and evaluates transactions to help obtain competitive pricing.  (Doc. No. 1 at ¶ 9.)  S&F has a history of servicing the mobile park industry and has arranged financing for mobile parks across the country.  (*Id.*)

In early 2013, Stursberg learned that KAW Parks, LLP, a Minnesota-based mobile park company, was looking to sell its holdings.  (*Id.* at ¶ 10.)  KAW owned two parks, Big Lake Mobile Home Park in Big Lake, Minnesota and Sherburne Village Mobile Park in Princeton, Minnesota.  (*Id.* at ¶ 11.)  Stursberg and one of his former clients, Kent Titcomb, arranged financing to acquire those parks from KAW.  (*Id.*)[1]

To proceed with the transaction, Stursberg and Titcomb formed a new entity, Amicorp Communities, LLC.  (*Id.* at ¶ 12.)  Amicorp Communities, a Florida limited liability company, was comprised of two members:  (1) Amicorp, Inc., a Florida corporation exclusively owned by Titcomb; and (2) 1648 Properties, LLC, a Pennsylvania limited liability company exclusively owned by Stursberg.  (*Id.*)[2]  Amicorp Communities was, in turn, the sole owner of KAW Parks

---

[1] Ladder Capital Finance LLC extended a loan to finance the acquisition of the two parks, which was secured by a mortgage, assignment of rents, and a security interest in general intangibles.  (*Id.* at ¶ 15.)  The original Note and Mortgage and other collateral was then assigned to Wells Fargo Bank N.A.  (*Id.*)

[2] Stursberg and Ticomb were supposed to have equal ownership in the venture, but the records reflect that Titcomb's entity, Amicorp, Inc., is a 51% owner and Stursberg's entity, 1648 Properties, is a 49% owner.

LLC, the entity that held title to the Big Lake and Sherburne Village parks.  (*Id.* at ¶ 13.)

Finally, another Florida limited liability company, Pinerock Properties, LLC, was formed, and

Amicorp Communities was its sole member.  (*Id.* at ¶ 14.)  Pinerock owns certain mobile homes

and tangible assets located in the Big Lake and Sherburne Village parks.  (*Id.*)

Even though Stursberg and Titcomb had not reached an operating agreement, Titcomb

assumed responsibility for managing the day-to-day operation of the parks, for which Amicorp

was to receive a 4% management fee.  (*Id.* at ¶ 16.)  Although Stursberg repeatedly requested an

accounting of the revenue and expenses, Titcomb refused to provide all the books and records

related to the parks' operation and only provided a portion of the company's financials.  (*Id.* at ¶

17.)

In 2017, Stursberg reached his breaking point and could no longer tolerate Titcomb's

secrecy.  (*Id.* at ¶ 18.)  Accordingly, the pair reached an agreement to seek a buyer for the mobile

home parks.  (*Id.*)  Stursberg located two separate buyers who were interested in acquiring the

parks:  Kjellberg's Inc., which offered $10.2 million, and Lakeshore Communities, Inc., which

offered $12.5 million.  (*Id.*)  Neither offer proceeded, however, because Titcomb, in his attempt

to hide his misappropriation of funds, interfered with the potential acquirers' due diligence and

review of the financial records.  (*Id.*)

In March 2018, Stursberg and Titcomb agreed to participate in pre-litigation mediation

and ultimately entered into an informal settlement agreement.  (*Id.* at ¶¶ 19–21.)  The settlement

agreement provided that 1648 Properties (Stursberg's entity) would acquire Big Lake park, and

Amicorp (Titcomb's entity) would retain Sherburne park.  (*Id.* at ¶ 20.)  The parties also agreed

that an accounting would be conducted to evaluate the assets of Pinerock, which held tangible

_____

(*Id.*)

assets and the accounts receivable for both parks.  (*Id.*)  The settlement agreement, however, was never formalized or carried through, in part due to Titcomb's attempts to insert new provisions that had never been agreed upon.  (*Id.* at ¶ 21.)

As a result, shortly thereafter, in May 2018, 1648 Properties initiated a civil action in Minnesota, alleging widespread misconduct by Titcomb individually and through his entities. (*Id.* at ¶¶ 22–23.)  Such misconduct included, *inter alia*, usurping a corporate opportunity to acquire a park adjacent to Sherburne park, without disclosing such opportunity to Stursberg or 1648 Properties; misappropriating $358,182 in funds by secretly charging a 6% consulting fee on top of a 4% management fee; improperly expensing travel expenses of $154,110; and submitting separate income and expense reports with no explanation for the different numbers.  (*Id.*)  The complaint sought specific performance of the settlement agreement, an accounting, appointment of a receiver, and the dissolution of KAW Parks, among other things.  (*Id.* at ¶ 23.)

In March 2019, 1648 Properties and Stursberg retained Morrison Sund to represent their interest in the Minnesota action.  (*Id.* at ¶ 24; *see also* Doc. No. 6-1, Stursberg Aff. at ¶ 2.)  For the next nine months, Morrison Sund "ran up legal fees of approximately $300,000 and accomplished basically nothing."  (Doc. No. 1 at ¶ 25; *see also* Stursberg Aff. at ¶ 4.) Specifically, Morrison Sund was unsuccessful in its attempt to appoint a receiver, could not enforce the settlement agreement, failed to obtain the books and records needed to conduct an accounting, and never conducted a deposition of Titcomb.  (Doc. No. 1 at ¶ 25.)  Rather, Morrison Sund "wasted time with sanctions motions and other unproductive activities."  (*Id.*)[3]

---

[3] During the course of the Minnesota action, the Wells Fargo loan, which had been obtained to finance the acquisition of the two Minnesota parks, went into default.  (Doc. No. 1 at ¶ 26.)  Unbeknownst to Stursberg, foreclosure proceedings ensued.  (*Id.*)  The firm "ignored a pending foreclosure action on the property owned by [1648 Properties] and allowed judgment to be entered in foreclosure, greatly harming 1648's bargaining position."  (Stursberg Aff. at ¶ 5; *see also* Doc. No. 1 at ¶ 26.)

Frustrated with the firm's lack of progress and its excessive bills, in November 2019, Stursberg notified Burton of the need to change counsel.  (*Id.* at ¶ 27; *see also* Stursberg Aff. at ¶¶ 6–7 ("After I paid approximately $100,000 of Morrison's invoices and had received almost $100,000 more in alleged billings, I complained about the extreme excess of the billings and lack of progress in proceeding to trial.  After Morrison refused to significantly reduce the bill or satisfy me that they were on track to obtaining a resolution of the case within a reasonable budget . . . [and] [a]fter further discussions concerning the bill went nowhere, I informed Morrison that since the billing dispute could not be resolved that I would have to change counsel.").)

Rather than wait for replacement counsel to enter an appearance, Morrison Sund unilaterally withdrew from the case, leaving Stursberg unrepresented.  (Doc. No. 1 at ¶ 27; *see also* Stursberg Aff. at ¶ 8.)  Morrison Sund also began sending Stursberg threatening emails regarding the firm's fees.  (Doc. No. 1 at ¶ 27.)  The firm claimed that Stursberg owed a total of $200,698.32, when 1648 Properties had already paid the firm $95,000.  (*Id.*; *see also* Stursberg Aff. at ¶ 8.)

On December 5, 2019, Burton ratcheted up the "threats" and stated that if he and Stursberg could not reach an agreement for payment, "I'm going to commence collection steps which you would be learning about tomorrow."  (Doc. No. 1 at ¶ 28; *see also* Stursberg Aff. at ¶ 8.)  Burton added, "that is not something that I want to do, but it [sic] something that I will do, if we don't reach an accord."  (Doc. No. 1 at ¶ 28.)  Stursberg demanded that Burton stop issuing collection threats, because the invoices appeared to be padded and included charges for work that he had not authorized.  (*Id.* at ¶ 29; *see also* Stursberg Aff. at ¶ 9.)

One month later, on January 8, 2020, Burton, on behalf of the Morrison Sund law firm,

filed an involuntary bankruptcy petition in the United States Bankruptcy Court for the District of Minnesota, No. 20-4005-KHS.  (*Id.* at ¶ 30.)  Stursberg was identified as the Debtor, and his Philadelphia residential address was listed.  (*Id.*)  "The Petition, [sic] falsely states that Stursberg was not paying his debts as they became due, unless they are the subject of a bona fide dispute as to liability or amount."  (*Id.*)  In the petition, Burton also "falsely alleged that [Stursberg] resided, had [his] principal place of business or had principal assets in Minnesota longer than any other district."  (Stursberg Aff. at ¶ 10.)[4]

The following week, on January 15, 2020, the bankruptcy court conducted an emergency hearing and granted Stursberg's request to dismiss the bankruptcy under 11 U.S.C. § 305(a)(1) and the doctrine of abstention.  (Doc. No. 1 at ¶ 31.)  Stursberg's counsel opted for the doctrine of abstention route so that Stursberg's creditors need not be notified of the petition in an attempt to limit the damage to Stursberg's reputation in the financial world.  (*Id.*; *see also* Doc. No. 1-6, Bankr. Hrg. Tr. at 4:12–5:7.)

The Honorable Kathleen N. Sanberg presided over the hearing (*see* Doc. No. 12 at ¶ 4) and admonished Burton and Morrison Sund for improperly using bankruptcy proceedings to collect firm fees.  (Doc. No. 1 at ¶ 32.)  The court told Morrison Sund's bankruptcy counsel: "You are, and I believe Mr. Burton, are very, very well [aware] of the cases that talk about the fact that an involuntary is not be used as a debt collection practice."  (*Id.*; *see also* Bankr. Hrg. Tr. at 27:3–6.)  Judge Sanberg continued:  "Because what I'm talking about is this was used as

---

[4] Stursberg avers that he has resided in Philadelphia for over 36 years, and his business has been located in Philadelphia for over 25 years.  (*Id.* at ¶ 11.)  Stursberg also submits that he "own[s] no assets in Minnesota, much less having owned them longer there than in any other district."  (*Id.*)  Stursberg asserts that he "merely hold[s] a membership interest in a Pennsylvania limited liability company, 1648, which owns a minority interest in a company [Amicorp Communities] which owns a mobile park home in Minnesota."  (*Id.*)

pressure, if you will, in order to collect the firm's fees. It wasn't done in the interest of all creditors, and that's what an involuntary is to do. An involuntary is being done for the purpose so that creditors are being paid, and that's not what this was being done for here. It was being used as a hammer, in order to collect the firm's fees." (Bankr. Hrg. Tr. at 27:13–21.) The court observed that the "whole case [] quite frankly, it smells bad." (*Id.* at 29:19–20.)

During the hearing, it also became apparent that the only knowledge that the law firm had regarding Stursberg's other creditors was from Stursberg himself. (Doc. No. 1 at ¶ 33.) In fact, Stursberg's other creditors were being paid, and one was overpaid and later returned the sum. (*Id.*; *see also* Stursberg Aff. at ¶ 13.) As noted above, the court dismissed the involuntary bankruptcy petition under § 305, granted the motion for expedited relief, sealed the records, and noted that with respect to mitigating damages, the provisions under 11 U.S.C. § 303(k)(2) "prohibit[ed] the reporting [sic] agencies." (Doc. No. 1 at ¶ 34; *see also* Bankr. Hrg. Tr. at 36:14–24.)

Notwithstanding the court's ruling, the next month, on February 20, 2020, Burton bypassed Stursberg's counsel and issued a letter directly to Stursberg and 1648 Properties at Stursberg's Philadelphia address. (Doc. No. 1 at ¶ 35; *see also* Doc. No. 1-7 at pp. 2–3; Stursberg Aff. at ¶ 17.) In the letter, Burton falsely stated that he had reached an oral settlement with R. Chris Sur (Stursberg's bankruptcy counsel) "at roughly 3:15 p.m. on January 9, 2020," and that the settlement included a waiver of Stursberg's claims against Morrison Sund PLLC. (Doc. No. 1 at ¶ 35; *see also* Doc. No. 1-7 at p. 2.) Burton also advised Stursberg, "Simply because we agreed to allow your involuntary bankruptcy case to be dismissed by way of abstention does not mean that we no longer intend to collect what is owed to the firm. In fact, the firm is unified in its desire to collect this amount by way of settlement or otherwise." (*Id.*)

Burton also enclosed the purported settlement agreement and a confession of judgment.  (Doc.

No. 1 at ¶ 36.)  According to Plaintiff, no such agreement had ever been negotiated.  (*Id.*;

Stursberg Aff. at ¶ 18.)

One month later, on March 26, 2020, Stursberg initiated the instant action against

Defendants, asserting claims for abuse of process, wrongful use of civil proceedings, IIED,

intentional interference with existing and prospective contractual relations, breach of

contract/malpractice, and credit defamation.  (*See generally* Doc. No. 1.)

## II.

As a threshold matter, we first address Defendants' argument that this case should be

dismissed under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process.[5]

(*See* Doc. No. 2-2 at pp. 19–20.)

Federal Rule of Civil Procedure 4(e) permits service to be made according to the state

law of the jurisdiction where the district court is located (here, Pennsylvania).  Fed. R. Civ. P.

4(e).  Under Pennsylvania law, a plaintiff may serve process on an out-of-state defendant through

"any form of mail requiring a receipt signed by the defendant or his authorized agent."  Pa. R.

Civ. P. 403; *see also Lampe*, 952 F.2d at 701.  "[C]ertified mail is a proper method of service on

out-of-state corporations under Pennsylvania law."  *Borah v. Monumental Life Ins. Co.*, No.

Civ.A. 04-3617, 2005 WL 83261, at *2 (E.D. Pa. Jan. 14, 2005). The party asserting the validity

of service bears the burden of proof.  *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d

476, 482 (3d. Cir. 1993).

---

[5] Although Defendants raise their service argument last, we must consider it first.  *See Lampe v. Xouth, Inc.*, 952 F.2d 697, 700–01 (3d Cir. 1991) ("It is an elementary requirement that personal jurisdiction must be established in every case before a court has power to render any judgment.  A court obtains personal jurisdiction over the parties where the complaint and summons are properly serviced upon the defendant.  Effective service of process is therefore a prerequisite to proceeding further in a case." (citations omitted)).

Here, Stursberg sent the complaint and summons to Morrison Sund and Burton on April 23, 2020 by certified mail.  (Doc. No. 2-3 at p. 11; *see also* Doc. No. 2-2 at p. 20.)  On April 27, the receptionist for Morrison Sund, Nicole Tessier, signed the returned receipt for the two certified letters.  (Doc. No. 2-3 at p. 11; *see also* Doc. No. 2-2 at p. 20.)  However, Tessier avers in a declaration that she is not authorized to accept service on behalf of Morrison Sund or Burton.  (*See* Doc. No. 2-3 at pp. 11–12; *see also* Doc. No. 2-2 at p. 20.)  Morrison Sund's manager, Erika Stein, also submitted an affidavit in which she averred that Tessier was not authorized to accept service.  (Doc. No. 2-3 at pp. 9–10; *see also* Doc. No. 2-2 at p. 20.)  On May 1, Morrison Sund informed Stursberg's counsel that Tessier was not authorized to accept service on behalf of either Defendant.  (*Id.* at p. 20.)

Defendants now argue that because Tessier was not authorized to accept service, neither Morrison Sund nor Burton was properly served.  (*Id.* at pp. 19–20.)  In response, Stursberg argues that Tessier was authorized to accept service by virtue of the fact that she was responsible for accepting mail and deliveries and accepted and signed the certified mail for Burton and Morrison Sund, and that Defendants are trying to evade service.  (Doc. No. 6 at pp. 8–10.)  To support his argument that Defendants are engaged in a game of hide-and-seek as to service, Stursberg points to the fact that he delivered the complaint to Defendants on three separate occasions.  (*Id.* at p. 10; *see also* Oral Argument Tr. at 38:4–19 (summarizing his response to Defendants' service argument as "really?" and explaining, "We gave them the complaint three times.  Before files [sic], I sent it to them as a courtesy in trying to resolve something.  It then was sent to them and it was unclear as to whether the summons was attached or not, you could not tell.  So it was then sent a third time.  And then we are told that the person who takes the mail is not obligated to accept service.  I think we quoted something from Judge Schiller about the

10

inappropriate conduct in trying to avoid service").)

Notwithstanding the persuasiveness of Stursberg's arguments that reverberate with common sense, coupled with the questionable nature of Defendants' behavior,[6] we find ourselves constrained by the case law and have no choice but to grant Defendants' motion as to insufficient service, given that Stursberg did not offer us any *proof*[7] that Tessier was authorized to accept

---

[6] We would be remiss to ignore Defendants' hypocrisy in how they have proceeded in this action. We therefore take the time to admonish Defendants, whose conduct appears to be underhanded and reeks of foul play. After all, the purpose of service of process is to provide proper notice to defendants of the claims asserted against them, and here Defendants clearly had notice, and had received the complaint three times. (*See* Oral Argument Tr. at 42:22–24 ("Yes, Your Honor, by the fact I am here arguing before Your Honor, Yes. They clearly had notice.").) Despite the fact that his clients had notice, Defendants' counsel argues, "Service of process, Your Honor, is in place for reasons . . . [T]he rules are the rules. And you have to follow the rules." (*Id.* at 42:18–25.) This argument strikes the Court as disingenuous, especially given the record before this Court that shows Defendants chose to ignore the rules in filing the involuntary bankruptcy petition. Apparently, "the rules are the rules" applies to everyone except Defendants.

Moreover, when Defendants alerted Plaintiff's counsel that Tessier was not authorized to accept service, they could have identified who the proper person to accept service was, rather than hiding the ball. But, ironically, although Defendants' counsel was crystal clear on the fact that Tessier was not authorized to accept service, when the Court questioned him on who was authorized to accept service, he struggled to come up with an answer and could not name any particular individual "in charge." (*See* Oral Argument Tr. at 21:5–7 ("The attorney or person in charge, I would assume a member of the firm or Mr. Burton, certainly in this case as a defendant.").) Nor was he aware of how the Firm was operating in the midst of the COVID-19 pandemic back in April (i.e., who was actually working in the office and could accept service) or if the Firm operated remotely and for how long. (*See id.* at 21:17–21, 22:10–22 ("I don't know the answer to that, Your Honor . . . and I don't want to misstate what their operations would be.").) Consequently, Defendants' position borders on the absurd.

[7] During oral argument, the Court questioned Plaintiff's counsel on whether Stursberg met his burden of showing service was proper, given that Plaintiff did not provide an affidavit or any other evidence related to service. Plaintiff's counsel responded, "Well, it seems to be somewhat of an argument of convenience when somebody comes in with this, that they take it, and then later say, Gee, I was not authorized, and they are the person who is in charge[.]" (Oral Argument Tr. at 38:20–39:22.) But this ignores Third Circuit case law, which requires some kind of proof that the person who signed the mail is an authorized agent of the defendant.

We sympathize with Stursberg, as it appears that Defendants are playing games and have been anything but straightforward and cooperative. But we cannot ignore the law. Our ruling could have been different had Stursberg provided any kind of evidence, even an affidavit, that laid out his position as to who Tessier was and her ability to accept service, as we are required to view all evidence and allegations in his favor at this point. But arguments or allegations in pleadings do not constitute *proof*, and that is all Stursberg has given us here.

service.  *See Lampe*, 952 F.2d at 701 ("Plaintiff admits that defendant did not sign the receipts

and has offered no proof that the signatures belong to the defendant's authorized agents.");

*Kornea v. J.S.D. Mgmt.*, 336 F. Supp. 3d 505, 509 (E.D. Pa. 2018) ("The burden is on the

plaintiff to show that the defendant or the defendant's authorized agent signed the return receipt.

The fact that an individual is the defendant's secretary or has the authority to accept mail on

behalf of the defendant does not establish that such an individual is an agent of the defendant

authorized to accept service of process . . . Plaintiff has not provided any information regarding

Evans or Talbot [the individuals who signed for the certified mail], nor has he established their

relationship to Defendants . . . Moreover, in affidavits submitted by Defendants, Talbot and

Evans explain that they are not authorized to accept service of court papers on behalf of

[defendants]."); *Ghost v. Victory Recovery Servs.*, Civil Action No. 14-215, 2014 WL 1515700,

at *2 (E.D. Pa. Apr. 17, 2014) ("When the named defendant does not sign a returned receipt, the

plaintiff must supply some proof that the individual who did so was an authorized agent of the

defendant."); *Furin v. Reese Teleservices, Inc.*, No. 2:07cv1542, 2008 WL 5068955, at *1 (W.D.

Pa. Nov. 24, 2008) ("[T]he Third Circuit has expressly recognized that the plaintiff bears the

burden of proffering a competent basis to show an authorized agent of the defendant has received

the complaint and offering proof that a mail clerk or receptionist signed for a package offers no

proof that the signatures belong to the defendant's authorized agents." (quotation marks and

citations omitted)).

Although Defendants admit that we have the discretion to quash service and allow

Plaintiffs to attempt to re-serve (*see* Oral Argument Tr. at 22:1–2), *see also* Ghost, 2014 WL

1515700, at *2 ("When granting a motion under Rule 12(b)(5), a district court has broad

discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply

quash service of process" (quotation marks and citation omitted)), we will exercise our discretion to dismiss the complaint, in light of our analysis below on personal jurisdiction and venue.

III.

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "The burden of demonstrating the facts that establish personal jurisdiction falls on the plaintiff," *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation marks and citations omitted), and the plaintiff must do so with "reasonable particularity," *Batista v. O'Jays, Inc.*, Civil Action No. 18-0636, 2019 WL 400060, at *3 (E.D. Pa. Jan. 30, 2019) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.3d 1217, 1223 (3d Cir. 1992)). When a court does not hold an evidentiary hearing, as is the case here, the plaintiff need only state a *prima facie* case of personal jurisdiction. *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Metcalfe*, 566 F.3d at 330.

In reviewing a 12(b)(2) motion, "a court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Lionti v. Dipna, Inc.*, Civil Action No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Metcalfe*, 566 F.3d at 330; *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). Nonetheless, "once a defendant has raised a jurisdictional defense, the plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe*, 566 F.3d at 330. A plaintiff may not merely rely on the allegations in the complaint to establish that jurisdiction exists. *See Lionti*, 2017 WL 2779576, at *1; *Pendergrass-Walker v. Guy M. Turner, Inc.*, Civil Action No. 16-5630, 2017 WL 2672634, at *3 (E.D. Pa. June 21, 2017); *Goodway Grp. v. Sklerov*, Civil Action No. 18-0900, 2018 WL

13

3870132, at *3 (E.D. Pa. Aug. 15, 2018); *Gutierrez v. N. Am. Cerruti Corp.*, Civil Action No.

13-3012, 2014 WL 6969579, at *2 (E.D. Pa. Dec. 9, 2014); *Yearwood v. Turner Constr. Co.*,

Civil Action No. 09-5945, 2011 WL 570003, at *2 (E.D. Pa. Feb. 15, 2011).

### A.  Personal Jurisdiction Legal Standard

A district court may exercise personal jurisdiction over a non-resident defendant to the

extent permitted by the law of the state in which the court sits.  *O'Connor v. Sandy Lane Hotel

Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also Mellon Bank*, 960 F.2d at 1221.  Pennsylvania's

long-arm statute authorizes courts to assert personal jurisdiction to the fullest extent allowed

under the United States Constitution.  42 Pa. Const. Stat. Ann. § 5322(b); *see also O'Connor*,

496 F.3d at 316; *D'Jamoos*, 566 F.3d at 102.  Under the Due Process Clause of the Fourteenth

Amendment, for a court to exercise personal jurisdiction over a non-resident defendant, the

defendant must "have certain minimum contacts with [the state] such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v.

State of Wash., Off. of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945)

(citation omitted); *see also O'Connor*, 496 F.3d at 316 ("[I]n determining whether personal

jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has 'certain

minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice.'") (citation omitted); *D'Jamoos*, 566 F.3d

at 102 (same).

There are two types of personal jurisdiction:  general jurisdiction and specific

jurisdiction.  *O'Connor*, 496 F.3d at 317.  "General jurisdiction is all-purpose" in that it

"allow[s] a court to exercise jurisdiction over the defendant for any claim lodged against that

party."  *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 2:15-cv-00965, 2020 WL 1526940,

at *3 (W.D. Pa. Mar. 31, 2020). Because Defendants are citizens of Minnesota and are not at home in Pennsylvania, Stursberg rightly does not argue that we have general jurisdiction over them.

In contrast, specific jurisdiction exists where the claims arise from or relate to the defendant's contacts with the forum state. *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998). "Because this analysis depends on the relationship between the claims and contacts, we generally evaluate specific jurisdiction on a claim-by-claim basis." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citation omitted); *see also Vizant Tech., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 628 (E.D. Pa. 2015). Under the traditional test, to determine whether specific jurisdiction exists, courts in this Circuit consider whether (1) the defendant "purposefully directed its activities at the forum"; (2) the litigation "arise[s] out of or relate[s] to at least one of those activities"; and (3) if "the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (quotation marks and citations omitted); *see also D'Jamoos*, 566 F.3d at 102.

In addition, the Supreme Court has endorsed a separate specific jurisdiction test for intentional tort claims, "which places emphasis upon the *effects* of a defendant's actions in the forum state." *Vizant Tech.*, 97 F. Supp. 3d at 628 (citing *Calder v. Jones*, 465 U.S. 783 (1984)) (emphasis added). The Third Circuit has instructed that, under the Supreme Court's *Calder v. Jones* decision, a plaintiff may demonstrate that personal jurisdiction exists if he or she shows: "(1) the defendant committed an *intentional tort*; (2) *the plaintiff felt the brunt of the harm in the forum* such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) *the defendant expressly aimed his tortious conduct at the forum* such that the forum can be said to be the focal point of the tortious activity." *Marten*, 499 F.3d at 297

15

(quoting *IMO Indus.*, 155 F.3d at 265–66) (emphasis added); *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001). This is known as the "effects test." *Marten*, 499 F.3d at 297.

The "effects test" allows a plaintiff to "demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are too small to comport with the requirements of due process' under [the] traditional analysis." *Id.*; *see also IMO Indus.*, 155 F.3d at 265 (explaining that *Calder* recognized that "the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum—which otherwise would not satisfy the requirements of due process—sufficient"). That said, the Third Circuit has recognized that "*Calder* did not change the fact that even in intentional tort cases the jurisdictional inquiry 'focuses on the relations among the defendant, the forum, and the litigation.'" *Id.* (citation omitted). "Nor did *Calder* carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state." *Id.*; *see also Marten*, 499 F.3d at 298 ("[T]he state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants.").

Accordingly, the mere fact that a plaintiff suffers harm in the forum state is not enough to give rise to personal jurisdiction in that state. *See, e.g.*, *Marten*, 499 F.3d at 297 ("Even if a defendant's conduct would cause foreseeable harm in a given state, such conduct does not necessarily give rise to personal jurisdiction in that state."); *IMO Indus.*, 155 F.3d at 265 ("[J]urisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum."); *Vizant Tech.*, 97 F. Supp. 3d at 629 ("*Calder*'s test . . . is not necessarily satisfied by the 'mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there.'"

(citation omitted)); *Applied Tech. Int'l, Ltd. v. Goldstein*, No. Civ.A. 03-848, 2004 WL 2360388, at *3 (E.D. Pa. Oct. 20, 2004) ("[J]urisdiction in intentional tort cases will not lie automatically in the plaintiff's home state simply because the plaintiff feels the brunt of the harm there." (citation omitted)).

Rather, to establish that a defendant "expressly aimed" his conduct at the forum state, the plaintiff must show "the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, *and point to specific activity* indicating that the defendant expressly aimed its tortious conduct at the forum." *Marten*, 499 F.3d at 297 (citation omitted); *IMO Indus.*, 155 F.3d at 266. Thus, "[s]imply asserting that the defendant knew the plaintiff's principal place of business was located in the forum [is] insufficient in itself to meet [the expressly aimed] requirement." *Id.* at 265.

## B.  Specific Jurisdiction Analysis

Although the parties failed to do so in their briefing, the law is clear that we must analyze specific jurisdiction with respect to *each* of Stursberg's six claims. *See Remick*, 238 F.3d at 255 ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over [a] defendant[] as to a particular claim . . . does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims."). We address each claim in turn, beginning with the breach of contract/malpractice claim, which we analyze under the traditional test, and then the intentional tort claims, which we analyze under the *Calder* effects test.

### *Count V: Breach of Contract/Malpractice Claim*

Stursberg asserts a breach of contract/malpractice claim, alleging that Defendants breached the parties' Retainer Agreement by unilaterally withdrawing from their representation

of Stursberg in the Minnesota action.  (Doc. No. 1 at ¶¶ 68–77.)

"A contract may provide a basis for the exercise of personal jurisdiction that meets due process standards, but a contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'"  *Grand Entm't Grp.*, 988 F.2d at 482 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  For contract claims, a plaintiff must establish that the defendant's contacts with the forum were "'instrumental in either the formation of the contract or its breach.'"  *Shafik v. Curran*, Civil Action No. 1:09-cv-02469, 2010 WL 2510194, at *5 (M.D. Pa. June 17, 2020) (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)) (exercising personal jurisdiction over breach of contract claim where the plaintiffs showed that the contacts were "instrumental" to the formation of the contract and its breach, given that a broad outline of the contract was created at a meeting held in Pennsylvania; the defendant's consistent emails and calls into Pennsylvania illustrated the work one of the plaintiffs was doing pursuant to the contract; and the defendant knew his communication terminating the contract would be received in Pennsylvania).

In determining whether it may assert personal jurisdiction over a breach of contract claim, a court should also consider prior negotiations and contemplated future consequences. *Grand Entm't Grp.*, 988 F.2d at 482 (quotation marks and citation omitted); *see also PR Gainesville, LLC v. UP Dev.—Gainesville 500 Acres, LLC*, Civil Action No. 18-957, 2018 WL 2021076, at *4 (E.D. Pa. May 1, 2018) ("Although contracting with a resident of the forum state is by itself insufficient to confer personal jurisdiction over a non-resident defendant, courts may consider the contract, as well as prior negotiations, the parties' actual course of dealing, and contemplated future consequences when deciding whether specific jurisdiction exists.") (citing *Vetrotex Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 151 (3d Cir. 1996)).

As a general matter, "[m]ail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support personal jurisdiction." *Grand Entm't Grp.*, 988 F.2d at 482–83 (concluding that the Spanish defendants had sufficient minimum contacts, where one of the defendants directed at least twelve communications to the forum and engaged in negotiations for an agreement that "would have created rights and obligations among citizens of the forum").

Here, Stursberg does not allege or aver in his affidavit that the contract negotiations took place in Pennsylvania, or otherwise show that Defendants' contacts with Pennsylvania were instrumental in the formation of the contract. (*See generally* Doc. No. 1; Stursberg Aff.)  Nor does Stursberg provide any information as to how many emails or phone calls he received from Defendants while in the forum, or any evidence on the parties' course of dealing from March to November 2019.

Stursberg avers, however, that Defendants sent invoices for their legal services to his office in Philadelphia (*see id.* at ¶ 3), and provides multiple invoices bearing his Philadelphia address (*see* Doc. No. 6-1 at pp. 7–23).  In addition, Stursberg proffers a letter that Burton sent to him in Philadelphia, claiming that a settlement agreement had been reached. (*See id.* at pp. 25–26.)  Taken together, we find these communications count toward the minimum contacts that support jurisdiction.

Notwithstanding our conclusion regarding the above communications, we have difficulty finding that this litigation arises out of or relates to those activities, particularly given the dearth of information that Stursberg has proffered.  In his complaint, Stursberg does not allege that Defendants breached the Retainer Agreement by inflating invoices over the course of the nine-month representation period, or by creating a purportedly never-agreed-upon settlement

agreement.  Rather, Stursberg alleges that by unilaterally withdrawing their representation in the Minnesota action without substitute counsel prepared to replace them, Defendants unduly prejudiced Stursberg, and therefore breached the contractual provision that stated that Defendants had the right to terminate the agreement and withdraw for any reason, provided that clients are not unduly prejudiced.  (Doc. No. 1 at ¶ 74; *see also id.* (alleging that the "threat and actual filing of a bad faith involuntary bankruptcy petition" was also unduly prejudicial).)

In other words, the alleged breach arises out of or relates to Defendants' unilateral withdrawal from the Minnesota action, prejudicing Stursberg—not from Defendants padding the invoices or creating a bogus settlement agreement.  Although Stursberg indicated the need to change counsel and Defendants withdrew their representation after an unresolved fee dispute, we find that the connection between Defendants mailing the invoices[8] and settlement agreement to Stursberg in Pennsylvania and Defendants' unilateral withdrawal (the alleged breach) is too attenuated.

In the alternative, we hold that Stursberg has waived this issue by not responding to

---

[8] Notably, nearly all of the invoices Stursberg attached to his affidavit are dated *before* November 2019 (*compare* Doc. No. 6-1 at p. 7 (Sept. 2019 invoice), *id.* at p. 10 (Aug. 2019 invoice), *and id.* at p. 13 (Oct. 2019 invoice), *with id.* at p. 20 (Nov. 2019 invoice)), which is when Defendants unilaterally withdrew from the case and their representation was terminated (*see* Doc. No. 1 at ¶ 27).  Therefore, to the extent that Plaintiff argues that the breach relates to Defendants' attempt to collect unreasonable fees *after* Defendants terminated their representation of him, he must rely only on the settlement agreement sent to Pennsylvania.

Even though Stursberg mentioned the provision that limits Defendants to recover only reasonable compensation upon the termination of their representation in his complaint, the focus still appears to be on Defendants' unilateral withdrawal.  (*See id.* at ¶¶ 75–76 ("Defendants [sic] *unilateral withdrawal* from its representation of Plaintiff [] limits it to quantum meriut [sic] recovery" because the agreement also contained a provision that "[i]f the Firm's services are terminated for any reason, clients shall pay reasonable compensation to the date of termination" (emphasis added)).)  In failing to clearly connect the dots between the unilateral withdrawal, an attempt to collect unreasonable fees after the withdrawal, and the breach, Plaintiff has not met his burden of establishing personal jurisdiction over this claim.

Defendants' arguments in his opposition brief,[9] or in his sur-reply.  *See, e.g.*, *Dreibelis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (affirming district court's finding of waiver as to an argument where the plaintiff "had ample opportunity to make [that] argument in response to defendants' motion to dismiss and failed to do so"); *Shoffner v. Wenerowicz*, Civil Action No. 15-00392, 2015 WL 4199075, at *5 (E.D. Pa. July 13, 2015) (dismissing plaintiffs' Fourth Amendment claim where the defendants moved to dismiss that claim and the plaintiffs never addressed the argument in their opposition brief).

***

We now turn to Stursberg's intentional tort causes of action:

### Counts I and II: Abuse of Process and Wrongful Use of Civil Proceedings

Stursberg brings an abuse of process claim, in which he alleges that Defendants misused the bankruptcy process by filing an involuntary bankruptcy proceeding to assist it in collecting fees.  (Doc. No. 1 at ¶¶ 38–47.)  In addition, Stursberg asserts a wrongful use of civil proceedings claim, premised on the same argument as his abuse of process claim—that Defendants wrongly used the bankruptcy proceeding as a collection practice.  (*Id.* at ¶¶ 49–53.)

In *Vizant Technologies, LLC v. Whitchurch*, 97 F. Supp. 3d 618 (E.D. Pa. 2015), the court held that personal jurisdiction existed as to the abuse of process claim under both the traditional test and the effects test.  *Id.* at 635.  Under the traditional test, the court explained that, "[i]f, as plaintiffs plead, defendants did engage in litigation and threats of litigation with the purpose of

---

[9] Stursberg only addresses the *Calder* effects test in his opposition brief, not the traditional test.  (*See* Doc. No. 6.)  As explained above, because breach of contract is not an intentional tort, the *Calder* effects test does not apply to this claim.  Moreover, when the Court questioned Plaintiff's counsel about whether Plaintiff had waived the breach of contract claim by not addressing the traditional test, counsel side-stepped the issue and did not address waiver or the traditional test specifically.  (*See* Oral Argument Tr. at 35:9–37:9 (discussing the breach of contract claim and adding, "So I think that we have articulated in the brief our disagreement in connection with, you know, the application of the *Calder* test.").)

extorting money from Vizant, a Pennsylvania-based company, then their conduct was 'purposefully directed' at Pennsylvania . . . in that they targeted a company located within the forum." *Id.* at 634–35.  As for the effects test, the court explained that abuse of process is an intentional tort and the plaintiffs pleaded that they 'felt the brunt of the harm' in Pennsylvania in that Vizant, based in Pennsylvania, has suffered reputational and financial harm as a result." *Id.* at 635.  Further, the tortious conduct was "expressly aimed" at Pennsylvania because the plaintiffs alleged that the "defendants' actions were meant to have an impact upon Vizant, which, as defendants were aware, is headquartered in Pennsylvania." *Id.*

Similarly, Stursberg argues that the filing of the involuntary bankruptcy petition against him was an extortion attempt.  (*See* Doc. No. 6 at p. 3 ("The sole purpose of the bankruptcy filing was to inflict pain in Pennsylvania to coerce payment of grossly inflated fees.").)  This is sufficient to show that Defendants' tortious conduct was expressly aimed at Stursberg, who Defendants were aware was located in Pennsylvania.  *See Vizant*, 97 F. Supp. 3d at 635.  Stursberg also avers that he felt the brunt of the harm in Pennsylvania.  (*See* Stursberg Aff. at ¶ 14 ("All of my banking and credit relationships are located in Philadelphia.  The bankruptcy froze all my credit and severely harmed my banking relationships.  I also serve as a financial advisor whose business and reputation also were severely harmed by the bankruptcy filing.  All of this damage was caused in Philadelphia, PA where I live, work and own property.").) Finally, Stursberg has adequately pled that Defendants committed the intentional torts of abuse of process and wrongful use of civil proceedings.  (*See, e.g.*, Stursberg Aff. at ¶¶ 11–12 (describing why "the entire claimed basis for filing a bankruptcy against [Plaintiff] in Minnesota was false"); Doc. No. 1 at ¶¶ 38–53 (alleging that Defendants wrongly used bankruptcy proceedings to collect disputed debts).)  Viewing the facts in the light most favorable to

Stursberg, we find that we may exercise personal jurisdiction over Counts I and II.

### Count III: IIED

In asserting his IIED claim, Stursberg claims that he suffered anxiety, humiliation, fear, embarrassment, and anger as a result of Defendants' threats to file, and then the actual filing of, an involuntary bankruptcy petition.  (Doc. No. 1 at ¶¶ 55–59.)  Stursberg did not make any averments in his affidavit regarding the emotional distress he has experienced.  (*See generally* Stursberg Aff.)

Nowhere in his brief does Stursberg explain the nexus between Defendants' conduct, Pennsylvania, and his IIED claim.  Nor does Stursberg even argue that the letters or invoices Defendants sent into this forum caused him emotional distress.  The mere fact that Stursberg has suffered anxiety, humiliation, fear, embarrassment, and anger in this forum is insufficient on its own to establish personal jurisdiction.  *See, e.g.*, *Marten*, 499 F.3d at 297.  We cannot find that Stursberg has met his burden of showing that Defendants "expressly aimed" their conduct at Pennsylvania as to his IIED claim.

### Count IV: Intentional Interference with Existing and Prospective Contractual Relations

Next, Stursberg asserts that Defendants have intentionally interfered with existing and prospective contractual relations.  Specifically, Stursberg pleads that "[a]t the time of Defendants' wrongful bankruptcy filing against Plaintiff, Plaintiff had other business deals and credit applications pending which were withdrawn and/or denied after the bankruptcy case was filed."  (Doc. No. 1 at ¶ 62.)  Further, "[e]ven after the bankruptcy petition was dismissed, Plaintiff was denied a loan due to the bankruptcy filing against him."  (*Id.* at ¶ 63.)  But nowhere in his complaint has Stursberg specified the location of the counter-parties to those business deals or contracts with which Defendants allegedly interfered.  (*See id.* at ¶ 61–66.)  Without

such information, it is difficult for the Court to conduct a proper personal jurisdiction analysis. Stursberg provides some additional information in his affidavit, in which he avers that "[a]ll of [his] banking and credit relationships are located in Philadelphia"[10] and that "[t]he bankruptcy froze all of [his] credit and severely harmed [his] banking relationships."  (*See* Stursberg Aff. at ¶ 14.)  But, in the bankruptcy proceeding (a transcript of which Stursberg attached to his complaint), Stursberg's own counsel discussed how Stursberg dealt with financial institutions that were not necessarily located or based in Pennsylvania.  (*See* Doc. No. 1-6 at 14:8–13 ("You know, both JPMorgan Chase, TD Bank, Citibank, and Barclays, which is four of his credit cards, these financial institutions, two in particular, like JPMorgan and Citibank he deals with on a [sic] basis.  *He works with all these large Wall Street banks*." (emphasis added)); *id.* at 34:4–20 ("I understand just within the next month he's got $22 million of transactions he intends to close, and one of those is later this week, one's next week, both of those, I think, together are about 12 million.  He tells me that when he goes through closing these transactions there is a very specific verification process that the banks – that these, you know, *worldwide, large financial institutions go through before they will wire money* . . . And he is extremely concerned.  These are banks that he works with through – has built his career on." (emphasis added)).)

At bottom, Stursberg appears to argue that personal jurisdiction exists over this claim simply because Stursberg and Stursberg's business are located in Pennsylvania, and they suffered harm here.  (*See* Doc. No. 1 at ¶ 66 ("[A]s a result of Defendants' interference with Stursberg's existing and prospective contractual relations, Stursberg suffered damages from lost profits and business opportunities."); Stursberg Aff. at ¶ 14 ("I also serve as a financial advisor whose business and reputation also were severely harmed by the false bankruptcy filing.  All of

---

[10] Stursberg does not, however, explicitly aver that those credit and banking relationships are the same contractual relations that were harmed by way of Defendants' alleged tortious interference.

this damage was caused in Philadelphia, PA where I live, work and own property.").)  Again, we reiterate that merely alleging that he and his business were injured in this forum is insufficient to establish personal jurisdiction.  *See, e.g.*, *Marten*, 499 F.3d at 297.  We cannot find that Stursberg has met his burden of showing that Defendants "expressly aimed" their conduct at Pennsylvania. Although Defendants could have reasonably foreseen that the involuntary bankruptcy petition they filed in Minnesota would have caused harm to Stursberg and Stursberg's business in Pennsylvania, that knowledge standing alone is insufficient to support personal jurisdiction.  *See Weiser Law Firm v. Hartleib*, Civil Action No. 19-2728-KSM, 2020 WL 5993628, at *17–18 (E.D. Pa. Oct. 9, 2020) ("[The defendant] did not meet with [the Firm's client] (nor with any of the Firm's other clients or potential clients) in Pennsylvania, nor were he or [the Firm's client] at any time located in Pennsylvania.  Rather, [the defendant], a California resident . . . contacted [the Firm's client], who resides in Michigan.  Although [the defendant] could have reasonably foreseen that his contacts with [the Firm's client] would have caused harm to Plaintiffs in Pennsylvania, that knowledge standing alone is insufficient to support personal jurisdiction.").

Furthermore, Stursberg did not provide any indication that Defendants themselves reached out to his creditors or others with whom he had contracts or potential business deals in Pennsylvania.  And the involuntary bankruptcy petition was not filed in Pennsylvania and was sealed.  Although we understand and certainly sympathize with Stursberg's argument—that Defendants should not be able to avoid jurisdiction in Pennsylvania by wrongly filing the involuntary bankruptcy petition in Minnesota, which was done by falsely representing that Stursberg resided, had a principal place of business, or had principal assets in Minnesota longer than anywhere else (such as Pennsylvania)—Stursberg has not cited a single factually analogous case to enable us to find in his favor here.  Rather, the weight of the law supports our conclusion

that merely alleging that he and his business were harmed in Pennsylvania is insufficient to establish personal jurisdiction and show that Defendants expressly aimed their conduct to this forum.

As a more general matter, we will also address Stursberg's broader arguments as to his intentional tort claims. First, in arguing that we have personal jurisdiction over his intentional tort claims, Stursberg cites to *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47 (3d Cir. 1988). (Doc. No. 6 at p. 15.) Stursberg states that in *Paradise Hotel*, "the Third Circuit [] found that a bad faith involuntary petition provide[d] a basis for state law claims of the intentional torts of wrongful use of civil proceedings, abuse of process and intentional interference with business relations" and that accordingly, because he has pled those same torts in this case, which were "directed at a Pennsylvania resident and having impact exclusively in Pennsylvania," we have an "ample basis" to exercise personal jurisdiction over Defendants. (*Id.*) In so arguing, Stursberg makes an unjustified leap, and reads far more into the Third Circuit's decision than is there. The *Paradise Hotel* decision Stursberg cites to is a *pre-emption* decision, *not* a personal jurisdiction decision. In fact, personal jurisdiction is not mentioned once in the entire opinion. Nor does Stursberg provide us with any indication that personal jurisdiction had been at issue in that case. Further, the decision itself does not indicate where the involuntary bankruptcy petition had been filed (i.e., whether it had been filed outside of the forum state, the Virgin Islands). We decline to extend the Third Circuit decision in *Paradise Hotel* in such an expansive way.

Second, in his sur-reply, Stursberg argues that personal jurisdiction is proper over all his claims because the involuntary bankruptcy petition could have only been properly filed in Pennsylvania, and Stursberg could have moved to transfer the matter to the correct venue (Pennsylvania) instead of moving for dismissal. (Doc. No. 16 at pp. 6–7.) During oral

argument, Stursberg's counsel characterized the decision to transfer or dismiss as a "Hobson's choice," arguing that transferring to the Eastern District would have "advertise[d]" the involuntary bankruptcy petition "even more" and "created more harm."  (Oral Argument Tr. at 34:3–22.)  Notably, Stursberg does not cite to a single analogous case (i.e., a case in which the court exercised personal jurisdiction over defendants who filed a bankruptcy petition purposely in the wrong venue and where the plaintiff moved for dismissal of the petition, rather than seeking to transfer the matter to the proper venue).  Further, the two cases Stursberg cites are inapposite.  *See Praetorian Specialty Ins. Co. v. Auguillard Constr. Co., Inc.*, 829 F. Supp. 2d 456, 466 (W.D. La. 2010) (exercising personal jurisdiction over defendants, the Stewarts, where they had "availed themselves of the benefits, privileges and protections of Louisiana by initiating a lawsuit in Orleans Parish [in Louisiana]" and where "the case at bar [was] also related to the lawsuit the Stewarts filed in Orleans Parish"); *Gen. Contracting & Trading v. Interpole, Inc.*, 940 F.2d 20, 23–24 (1st Cir. 1991) ("[B]y bringing Suit No. 2, Trastco submitted itself to the district court's jurisdiction in Suit No. 1.  Trastco elected to avail itself of the benefits of the New Hampshire courts as a plaintiff, starting a suit against Interpole.  By doing so, we think it is inevitable that Trastco surrendered any jurisdictional objections to claims that Interpole wished to assert against it in consequence of the same transaction or arising out of the same nucleus of operative facts [in New Hampshire] . . . Upholding the forum court's assumption of jurisdiction over Trastco in Suit No. 1 seems a small price to exact for allowing Trastco to purposefully avail itself of the benefits of a New Hampshire forum as a plaintiff in Suit No. 2.").  These cases are distinguishable because Defendants did not file the bankruptcy petition in the current forum, Pennsylvania (even if, as Plaintiff contends, they should have done so).

Third, Stursberg argues that we have personal jurisdiction because Defendants engaged in

debt collection activities, by sending the "coercive" settlement agreement to him in Pennsylvania. (*See* Doc. No. 16 at p. 8 ("Defendants did not limit their conduct to a bankruptcy filing. They purposefully directed a subsequent mail communication to Stursberg in Pennsylvania . . . threatening him and attempting to obtain his signature on a coercive 'Settlement Agreement' in an effort to collect a disputed debt. It is universally held that debt collection activities directed into a forum confer personal jurisdiction over the creditor attempting such communications.").) But Stursberg does not explain how the settlement agreement Defendants sent to him in Pennsylvania, after the involuntary bankruptcy petition was dismissed, relates to his intentional tort claims, including his claims of intentional interference with prospective or existing contracts and credit defamation. Indeed, as explained above and discussed below, the heart of the tortious interference and credit defamation claims is that Defendants' filing of the involuntary bankruptcy petition injured Stursberg.

Moreover, the cases on which Stursberg relies are inapplicable here because in those Fair Debt Collection Practices Act ("FDCPA") cases, the claims directly arose from the debt collection letters. Further, these cases are not binding on this Court. *See Varela v. Pee Dee Med. Collection Servs.*, Civil Action No. 18-17196 (SDW)(LDW), 2019 WL 2083297, at *2 (D.N.J. May 6, 2019) ("Here, defendants intentionally mailed three collection letters to plaintiff at his New Jersey address seeking payment of a medical bill, and in so doing, purposely directed collection efforts at the forum state. And there can be no doubt that plaintiff's claim that the language of the collection letters was false or misleading under the FDCPA directly arises from the defendants' act of mailing those letters to New Jersey."); *Russey v. Rankin*, 837 F. Supp. 1103, 1105 (D.N.M. 1993) (exercising personal jurisdiction in FDCPA case where the defendants "are alleged to have initiated their collection efforts by knowingly sending a demand

letter to a New Mexico resident" and explaining that "[b]ecause [the defendants'] written correspondence is the nucleus of the alleged wrongful conduct rather than just an ancillary contact with the forum, it was reasonable to have anticipated being hailed into New Mexico court on claims based upon the letter); *Bray v. Cadle Co.*, Civil Action No. 4:09-cv-663, 2010 WL 4053794, at *1–2 (S.D. Tex. Oct. 14, 2010) (involving defendants' garnishment of plaintiff's funds in Texas, in which plaintiff sought, *inter alia*, a declaratory judgment that the Social Security Act prohibited defendants from garnishing plaintiff's social security funds, damages under the Fair Debt Collection Practices Act, Texas common law claims (including abuse of process), and alleged violations of the Texas Deceptive Trade Practices Act and Texas Debt Collection Act, and where there had been five state court lawsuits between plaintiff and defendants over the loan at issue).

### Count VI: Credit Defamation

Last, Stursberg alleges that Defendants defamed him to his creditors by filing the involuntary bankruptcy petition on the public docket with the bankruptcy court.  (Doc. No. 1 at ¶¶ 79–84.)  Stursberg alleges that as a public filing, the petition "was received by credit reporting services and transmitted to potential clients and lenders," all of whom understood it to mean that "Plaintiff was financially insolvent and not credit worthy."  (*Id.* at ¶ 81.)

In his opposition brief, Stursberg did not cite to any personal jurisdiction case specific to credit defamation.  (*See generally* Doc. No. 6.)  We find the Third Circuit's analysis in *Remick v. Manfredy*, a regular defamation case, instructive.  There, the plaintiff's defamation claim arose out of two letters, both of which were sent to the plaintiff—a sports and entertainment law attorney—in Pennsylvania but had no Pennsylvania recipients copied.  238 F.3d at 257–58.  The second letter was then allegedly published and distributed elsewhere within the boxing

29

community.  *Id.* at 258.  The Third Circuit concluded that the plaintiff had satisfied the first two

elements of the effects test because defamation is an intentional tort, and the plaintiff's

professional activities were centered in Pennsylvania and the allegedly defamatory letters

questioned his professional ability, such that he could reasonably contend that he suffered the

brunt of the harm in the forum.  *Id.*

       However, the Third Circuit determined that the plaintiff had not satisfied the "expressly

aimed" prong.  *Id.* at 259.  The court emphasized that according to the plaintiff, the allegedly

defamatory letters were published throughout the boxing community at large, not just in

Philadelphia.  *Id.*  The Third Circuit considered it "significant" that the plaintiff "ha[d] not

asserted that Pennsylvania has a unique relationship with the boxing industry."  *Id.* (noting that

the boxing community professionals who received the letter "were apparently located throughout

the country").  The Third Circuit distinguished the Supreme Court's *Calder* decision and

elaborated:  "Unlike the defendants in *Calder*, whose national magazine is published in

California more than any other state and whose story focused on California, it cannot be said that

the defendants here expressly aimed their conduct at Pennsylvania so that Pennsylvania was the

focal point of the tortious activity."  *Id.*; *see also Noah Bank v. Sunday J. USA Corp.*, Civil

Action No. 18-1413, 2018 WL 6622999, at *4 (E.D. Pa. Dec. 18, 2018) ("First, as in *Remick* and

unlike in *Calder*, there is no indication that the dissemination of the defamatory statements was

concentrated in the forum state.  Plaintiffs have not come forward with any facts indicating that

Defendants' website is read extensively in Pennsylvania—setting this case apart from *Calder*,

where a disproportionate amount of the readership was based in the forum state. . . . Finally, as in

*Remick* but unlike *Calder*, Plaintiffs have not indicated that their industry as a whole is uniquely

tied to Pennsylvania.").

Here, as Defendants correctly observe (*see* Doc. No. 2 at pp. 10–11), Stursberg fails to show (or, even argue) that the publicly filed involuntary bankruptcy petition would be uniquely available for viewing in Pennsylvania (*see generally* Doc. Nos. 1, 6.).  Although Stursberg avers that he has special creditor and banking relationships in Pennsylvania (*see* Stursberg Aff. at ¶ 14 ("All of my banking and credit relationships are located in Philadelphia")),[11] he does not offer a counter to the fact that the filing was publicly available across the country.  In other words, he fails to explain how a publicly filed document that could be accessed by anyone across the country was expressly aimed at Pennsylvania specifically.  Significantly, Stursberg fails to even argue that because his creditors were largely based in Pennsylvania, there was a unique relationship with the forum in that the publication was disproportionately viewed here.  As it stands, the mere averment that his creditors and banking relationships were located in Pennsylvania, without more, is insufficient. We therefore cannot exercise personal jurisdiction over Count VI.

## III.

In deciding a motion to dismiss for improper venue under Federal Rule of Civil

---

[11] Stursberg's own counsel's representations in the bankruptcy proceeding undermine the veracity of Stursberg's representation that all of his banking and creditor relationships are in Pennsylvania.  (See Doc. No. 1-6 at 14:8–13 ("You know, both JPMorgan Chase, TD Bank, Citibank, and Barclays, which is four of his credit cards, these financial institutions, two in particular, like JPMorgan and Citibank he deals with on a [sic] basis.  *He works with all these large Wall Street banks*." (emphasis added)); *id.* at 34:4–20 ("I understand just within the next month he's got $22 million of transactions he intends to close, and one of those is later this week, one's next week, both of those, I think, together are about 12 million.  He tells me that when he goes through closing these transactions there is a very specific verification process that the banks – that these, you know, *worldwide, large financial institutions go through before they will wire money* . . . And he is extremely concerned.  These are banks that he works with through – has built his career on." (emphasis added)).)

Likewise, we also note that in his complaint, Stursberg alleges that his business, S&F, "has built a reputation for servicing the mobile park industry having arranged financing for parks from New York to California."  (Doc. No. 1 at ¶ 9.)

Procedure 12(b)(3), we must accept all of Stursberg's allegations as true, unless those allegations

are contradicted by Defendants' declarations. *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x

157, 158 n.1 (3d Cir. 2012); *N. Am. Commc'ns, Inc. v. Eclipse Acqui Inc.*, Civil Action No. 3:17-

167, 2018 WL 651795, at *4 (W.D. Pa. Jan. 31, 2018).   Unlike jurisdictional challenges, when

challenging venue, the *defendant* bears the burden of showing improper venue.  *Bockman*, 459 F.

App'x at 160.   When jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1391 governs

venue.  Under § 1391(b), a plaintiff may bring a case in:

> (1) a judicial district where any defendant resides, if all defendants reside in the
> same State; (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property that is
> the subject of the action is situated; or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the action is commenced,
> if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b)(1)–(3); *see also Bockman*, 459 F. App'x at 160.  Here, given that

Defendants reside in Minnesota, the only way venue is proper in the Eastern District of

Pennsylvania is if § 1391(b)(2) applies (i.e., if a substantial part of the events or omissions giving

rise to Plaintiffs' claims occurred in this District).

    As the Third Circuit explained in *Cottman Transmission Systems, Inc. v. Martino*, 36

F.3d 291 (3d Cir. 1994), "the statutory language of [§ 1391] favors the defendant in a venue

dispute by requiring that the events or omissions supporting a claim be 'substantial.'  Events or

omissions that might only have some tangential connection with the dispute in litigation are not

enough." *Id.* at 294.  "Substantiality is intended to preserve the element of fairness so that a

defendant is not haled into a remote district having no real relationship to the dispute." *Id.*

Further, in determining whether a substantial part of the events or omissions giving rise to a

cause of action occurred in a particular district, "[t]he test . . . is not the defendant's 'contacts'

with a particular district, but rather the location of those 'events or omissions giving rise to the

claim.'"  *Id.*; *see also Bockman*, 459 F. App'x at 160.

However, "Section 1391(b) does not require this Court to determine the 'best' forum, or 'the forum with the most substantial events.'  In fact, venue may be proper in more than one district.  It is necessary 'only that a substantial part of the events occurred here.'"  *Lannett Co., Inc. v. Asherman*, Civil Action No. 13-2006, 2014 WL 716699, at *4 (E.D. Pa. Feb. 24, 2014) (citations omitted); *see also id.* at *3 ("Because § 1391 does not require a majority of the events take place here, nor that the challenged forum be the best forum for the lawsuit to be venued, it is irrelevant that a more substantial part of the events took place in another district, as long as a substantial part of the events took place in [this] district as well.  At bottom, the substantiality inquiry is more qualitative than quantitative." (internal quotation marks and citations omitted)); *Leone v. Cataldo*, 574 F. Supp. 2d 471, 483–84 (E.D. Pa. Aug. 11, 2008) ("'The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as substantial activities took place in A, too.  Indeed, district A should not be disqualified even if it is shown that the activities in district B were more substantial, or even the most substantial.'" (quoting the Commentary following the revisions to § 1391)).  When deciding venue, a court "does 'not [look] to a single triggering event prompting the action, but to the entire sequence of events underlying the claim.'"  *Id.* (quoting *Uffner v. La Reunion Francaise*, 244 F.3d 38, 42 (1st Cir. 2001)).

### Counts I and II: Abuse of Process and Wrongful Use of Civil Proceedings

The crux of Stursberg's abuse of process and wrongful use of civil proceedings claims is that Defendants have misused the bankruptcy process by using it as a collection process.  (*See* Doc. No. 1 at ¶¶ 38–53.)

In determining whether Stursberg's abuse of process and wrongful use of civil

proceeding claims are properly venued, we consider where the legal action giving rise to

Stursberg's claim arose. For example, in *Tucker v. Interscope Records*, No. 98-4288, 1999 WL

80363 (E.D. Pa. Feb. 17, 1999), the plaintiffs asserted malicious prosecution and abuse of

process claims in the Eastern District of Pennsylvania, and their claims arose out of two lawsuits

that had been filed against one of the plaintiffs in the Central District of California. *Id.* at *1.

The court concluded that venue was improper, reasoning that a substantial portion of the events

did not take place in the Eastern District. *Id.* at *2. The court explained:

> All of the events alleged in Plaintiffs' complaint relate to the allegedly tortious
> prosecution of the California lawsuits instituted against Mrs. Tucker, [one of the
> plaintiffs]. Those lawsuits were litigated in the Central District of California and
> the alleged abuse of process about which Plaintiffs complain, such as the notices
> of deposition for Mrs. Tucker's depositions, were issued in the Central District of
> California. None of the discovery in those cases . . . took place within the Eastern
> District of Pennsylvania.

*Id.* Although the plaintiffs pointed to a few activities that occurred within the District, the court

found that those events were only tangentially connected to the instant lawsuit. *Id.*; *see also*

*Weiser Law Firm*, 2020 WL 5993628, at *21 (holding that venue was improper as to abuse of

process claim and noting that "Plaintiffs' claims do not arise out of any lawsuit in the Eastern

District of Pennsylvania—rather, they primarily arise out of the Sprint derivative action in

Kansas and [the defendant's] civil action against Plaintiffs in Kansas"); *Farkas v. Rich Coast*

*Corp.*, Civil Action No. 2:13-cv-00926-LPL, 2014 WL 550594, at *23 (W.D. Pa. Feb. 11, 2014)

(holding that venue was improper and reasoning that "a substantial portion of the events giving

rise to [the] abuse of process claim occurred in Mifflin County, as that is where the Replevin

action [that provided the basis for the abuse of process claim] was brought"); *accord. Cmty.*

*Surgical Supply of Toms River, Inc. v. Medline DiaMed, LLC*, Civil Action No. 11-00221

(GEB)(TJB), 2011 WL 3235706, at *3–4 (D.N.J. July 28, 2011) ("Neither party submitted, nor

has this Court found, authority in this District regarding claims for malicious use of process filed

in a different venue from where the claim has been filed . . . [A]s the events giving rise to this claim involve the use of process related to the TRO Action in Ohio, New Jersey is not the proper venue[.]").

We are persuaded by these cases and observe that Stursberg's abuse of process and wrongful use of civil proceeding claims do not arise out of any legal proceeding in the Eastern District of Pennsylvania—rather, they arise out of a bankruptcy petition that he alleges was wrongly filed in the United States Bankruptcy Court for the District of Minnesota, to collect legal fees that Defendants incurred while representing Stursberg in a Minnesota action.

Stursberg attempts to distinguish these cases in his sur-reply, noting that in those cases, venue was proper in the underlying case. He contends that those cases do not apply to his situation because venue was not proper in Minnesota over the underlying bankruptcy matter. (Doc. No. 16 at p. 10.) However, Stursberg admits that "there are no cases precisely on point." (*Id.*) In addition, as we previously noted, Stursberg also argues that personal jurisdiction *and venue* are proper in this case because the involuntary bankruptcy petition could have been properly filed only in Pennsylvania, and Stursberg could have moved to transfer the matter to the correct venue (Pennsylvania) instead of moving for dismissal. (Doc. No. 16 at pp. 6–7.) Again, the cases Stursberg cites are distinguishable. *See Praetorian*, 829 F. Supp. 2d at 471 (concluding that venue was proper, and that a substantial part of events giving rise to the insurance coverage dispute occurred in the Western District of Louisiana, where the insurance policies had at all times been administered in Shreveport, Louisiana (located in the Western District) and the original application for the insurance policies was received in Shreveport and the policies were also rated and underwritten there); *Gen. Contracting & Trading Co.*, 940 F.2d at 21–25 (no discussion of venue).

Stursberg also argues that venue is proper in the Eastern District because Stursberg received debt collection-related communications in this District. (Doc. No. 16 at p. 9.) He contends that "[t]his is fundamentally a debt collection case, and venue is proper where the acts pertaining to debt collection were conducted, i.e., the mailings of invoices and the collection letter, as well as the intended impact of the bankruptcy, which could only be filed properly in Pennsylvania." (*Id.*) But the cases on which Stursberg relies are distinguishable. *See Fitzhenry v. Guardian Prot. Servs., Inc.*, Civil Action No. 16-1253, 2016 WL 6652760, at *1 (W.D. Pa. Nov. 9, 2016) (transferring venue to South Carolina because "[u]nder the TCPA [Telephone Consumer Protection Act], venue is proper where the phone call is received" and the call was received in South Carolina); *Apostolou v. Mann Bracken, LLC*, Civil Action No. 07-4950 (PGS), 2009 WL 1312927, at * (D.N.J. May 1, 2009) (finding venue was proper in FDCPA case and explaining that "the majority of FDCPA cases have held that the plaintiff's claim arises in the district in which the plaintiff received the offending communication or debt collection letter" (quotation marks and citations omitted)). In addition, Plaintiff's claims for abuse of process and wrongful use of civil proceedings do not relate to the invoices or settlement agreement (debt collection activities) that Stursberg received at his Philadelphia address, in the Eastern District; rather, those claims, as pled, are related to the involuntary bankruptcy petition Defendants filed in Minnesota.

As noted above, although we certainly appreciate Stursberg's argument that Defendants should not be permitted to falsely represent that he resided, had a principal place of business in, or had principal assets in Minnesota longer than any other District, as was necessary to file an involuntary bankruptcy petition in Minnesota, and that Defendants should not be rewarded for

forum shopping,[12] on the facts before us, we cannot find that the substantial threshold has been reached here. [13]   Accordingly, we find that venue is not proper as to Counts I and II.

VI.

Because we find that service was not properly effectuated, that we do not have personal jurisdiction over Counts III, IV, V, and VI, and that we do not have venue over Counts I and II, we do not consider the parties' arguments as to whether Stursberg's state law tort claims are pre-empted by the federal bankruptcy code.  Rather, pursuant to Fed. R. Civ. P. 12(b)(5), we dismiss Stursberg's complaint, without prejudice.

An appropriate order follows.

---

[12] Stursberg asserts:  "The only argument that defendants can make is that they intentionally filed the bankruptcy in the wrong district to forum shop.  In federal courts, forum shopping is not rewarded." (Doc. No. 16 at pp. 9–10.)  We admonish Defendants for their behavior to the extent they engaged in forum shopping and filed the petition in the wrong venue.  That said, the cases on which Stursberg relies for his forum shopping argument involve very different factual situations.  *See N.Y. Life Distributors, Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 383 (3d Cir. 1995) (holding that a "discretionary standard . . . governs the district court's decision to dismiss an action commenced under the interpleader statute during the pendency of parallel state court proceedings" and discussing forum shopping in this context only); *Aetna, Inc. v. Jones*, Civil Action No. 06-CV-2245, at *7 (E.D. Pa. Jan. 24, 2007) (same).

[13] Stursberg argues that where the effects test is satisfied, venue is proper, but only cites to one case in this District so holding.  (Doc. No. 6 at p. 16.)  In *Walsh v. Alarm Security Group, Inc.*, 157 F. Supp. 2d 501, 509 (E.D. Pa. 2001), in finding that venue was proper, the court's reasoning did not solely hinge on its conclusion that the *Calder* effects test was satisfied.  *Id.* at 509.  Indeed, the court also explained "the event giving rise to all of Plaintiff's causes of action [was] the refusal of the Defendants to honor their contract and make payment to Plaintiff in Pennsylvania.  Plaintiff's injury occurred as a result of the non-payment of wages and other benefits of employment due in Pennsylvania."  *Id.*

37